## JOHN S. ELLERY *versus* THE NEW ENGLAND INSURANCE COMPANY.

Insurance was made on a ship "at and from Boston to all ports and places on the globe, and until her return to Boston, not exceeding two years." She sailed from the coast of Brazil for Boston, and on arriving in Boston bay, below the harbour, was ordered by the owner to put into Salem, the two years not having yet expired. She accordingly put into that port, for the purpose of being repaired. *Held*, that the risk did not terminate on her arrival at Salem.

The destination of the vessel to Boston did not, in such case, limit the risk insured, thereafter, to that voyage, but the owner might, at any time before her arrival at Boston, alter her destination, and the risk would still continue.

Putting into Salem in such case was not a deviation.

Under such a policy, visiting the same port more than once is not a deviation.

A damage done to a ship by the violence of the wind during an attempt to haul her upon a marine railway to be repaired, and while she is partly on land, is covered by a policy of insurance against loss by the perils of the seas and "all other losses to which assurers are liable," this being a loss *ejusdem generis* with those specified.

Where a new and a safe mode of repairing ships has come into use since the making of insurance on a ship, the assured may avail himself of it without prejudice to the policy.

Thus a ship was insured for two years, by a policy made at Boston, where there was no marine railway, and before the expiration of the time she put into a neighbouring port to be repaired upon such a railway, this mode of repairing having there got into pretty general use since the making of the policy, and while she was hauling up the railway she was blown over and bilged ; and it was *held*, that this was a loss within the general words of the policy, " all other losses and misfortunes to which assurers are liable by the rules and customs of insurance in Boston."

THIS was *assumpsit* on a policy of insurance for 4000 dollars on the ship Panther " at and from Boston to all ports and

---

places on the globe and until her return to Boston, not exceeding two years from this date, September 11, 1824, at noon. The assured has liberty to cancel this policy at any time, by paying the amount of premium due *pro rata*, the same not to be less than two and a half per cent." The premium was at the rate of five per cent *per annum*.

During the period of the risk, the ship sailed from the coast of Brazil bound for Boston, for the purpose, as stated by the mate, of being there repaired and coppered. She arrived in Boston bay on the 10th of May, 1826, and fired a gun for a pilot, and was boarded by one about midnight, by whom the owner sent orders to the master to go into Salem for repairs. She accordingly put into Salem. where preparations were made for hauling her upon the marine railway to make the repairs. As she was hauling up, and while she was yet partly water-borne, her bow being supported on the cradle of the railway, either owing to the wind, which was violent and blew in gusts at the time, or to some defect in fitting the blocks to her bottom, for the purpose of supporting her on the railway, or to both of these causes, she heeled and fell partly over on her side, some of the blocks breaking quite through her side, so that the water was admitted and ebbed and flowed in her hold, and she was so injured, either at the time, or then and afterward by lying in that position, that she was not worth repairing. This action was brought to recover for the damage occasioned by this accident.

Questions arose in the course of the trial, as to the correctness of the representations of the master, respecting the shape and model of the ship, to the superintendent of the railway, and whether his description of her as " very flat amidships and cut up at each end," did not mislead the superintendent as to blocking and securing her on the railway ; but the testimony appeared to support and justify this representation of her captain. Testimony was also introduced, as to the expediency and safety of attempting to haul her out in the state of the wind at the time ; in regard to which the opinions of the witnesses differed.

Neither at the time of effecting the policy, nor when the Panther returned to the United States, was there any marine

Ellery
*v*
New Eng.
Ins. Co.
16

railway in use in Boston for the purpose of repairing vessels, and the Salem railway had been in use but a short time, having been completed in 1824. Only three vessels had been hauled up and repaired upon it during that year. The following year it was very much used, from 140 to 150 vessels having been repaired upon it during the year, some of which were sent from Boston for this purpose. A number of witnesses stated that this way of repairing was preferable to heaving out the vessels, which had been previously in use in Boston and Salem.

It did not appear from the testimony, what was the intended destination of the ship, after the repairs should be made ; whether it was intended that she should proceed to Boston to discharge her cargo there, or go to some other port. The crew, excepting two officers and four men, were discharged on her arrival at Salem.

After the enumeration of particular risks, the policy provided that the underwriters should be liable for " all other losses and misfortunes to which assurers are liable by the rules and customs of assurance in Boston." Mr. Balch, president of an assurance office in Boston, said he did not recollect a loss on a vessel insured as this was, and under precisely similar circumstances ; but under policies on time, he had paid losses happening on vessels while they were repairing in the dry docks at Liverpool.

During the absence of the Panther, she had twice visited the same port in South America.

The declaration contained four counts ; 1. for a loss by the ship's being blown over on the marine railway ; 2. for a loss by the perils of the seas ; 3. for money paid, laid out and expended ; and 4. for money had and received.

The jury found a verdict for the plaintiff for a total loss. They also found that the loss was not attributable to any carelessness or misconduct of the master, or of the superintendent of the railway.

June 17th,
1828.

*Webster*, *Saltonstall* and *Mason*, for the defendants, contended that the policy was one for a voyage, and not merely on time. The latter expires by the mere efflux of time. In this, the risk is to end in Boston, if the ship returns within two

years. It is a policy on a voyage terminating at Boston. *Stocker* v. *Harris*, 3 Mass. R. 409 ; *Cleveland* v. *Union Ins. Co.* 8 Mass. R. 308. The insured has liberty to go from port to port, but this liberty is limited to two years, or the arrival of the ship in Boston before the expiration of that time. Policies of this kind are mentioned in the books. Valin's Com. *lib.* 3, *tit.* 6, *art.* 35 ; 3 Pardessieux on Commercial Law, 270. When the election was made to return to Boston, the risk became the same as if that voyage had been inserted in the policy ; and accordingly, going to Salem was a deviation, as it was not for any purpose connected with that voyage. It was also a deviation for the ship to visit the same port twice under this policy, as the Panther was proved to have done in South America. In *Mellish* v. *Andrews*, 16 East, 312, liberty was given to touch at all places in the East Indies, and touching a second time at the same place was held to be a deviation. In *Thorndike* v. *Bordman*, 4 Pick. 471, the Court restrict the liberty of touching to the purposes of the voyage.

The policy is against perils of the sea ; this was a loss on land, and so not within the policy. The bows of the ship were fast, the stern only being water-borne, when the loss took place. If she had remained afloat, she would not have been damaged, as no other vessel in Salem was injured at that time *Thompson* v. *Whitmore*, 3 Taunt. 227 ; *Fletcher* v. *Inglis*, 2 Barn. & Ald. 315. The circumstance that the ship was taken out of the water by mechanical means, makes this case still stronger.

The rules and customs of Boston are referred to in the policy, but this mode of repairing was a new invention, and so not within the contemplation of the parties at the time of making the policy.

The verdict is against evidence as to the negligence of the master, or the superintendent of the railway, and so the underwriters are not liable. Phil. on Ins. 224, *et seq.* [*Parker* C. J. There is no question that the insurers are not answerable for a loss that manifestly arises directly and wholly from the negligence of the assured or his agents ; the only doubts are, as to the fact and the degree of negligence by which the

Ellery
*v.*
New Eng.
Ins. Co.

insurers shall be exonerated.]   In *Carruthers* v. *Sydebotham,* 4 Maule & Selw. 77, the whole question related to the privity between the owners of the vessel and the pilot, through whose negligence or want of skill the accident happened, and the court considered the pilot not to be the agent of the insured. The present case is distinguished from that, for here the master was himself a part-owner, and both he and the superintendent of the railway were agents of the owners.   The underwriters may not be answerable for losses by the negligence and unskilfulness of those whom the owner is obliged to employ.*   He must, for instance, take such a pilot as the government supplies.   But where he is at liberty to choose, as in appointing a master or employing persons to make repairs, he is answerable for their skill and conduct.   As to the novelty of this mode of repairing, it is not contended that the assured may not adopt a new mode, provided it is previously proved to be a safe one ; but he must not make experiments at the risk of the underwriters.

*S. Hubbard* and *C. G. Loring,* for the plaintiff, said this could not be an insurance on any particular voyage, as none was marked out by the policy, nor was any object or enterprise expressed.   If this was an insurance for two years, unless the assured chose to terminate it sooner (and so it is very distinctly expressed to be in the policy), the the going into Salem was connected with the risk insured ; for the vessel needed repairs, as was very fully proved, and the assured had not only a right, but was bound, to make repairs.   The case of *Pelly* v. *Roy. Exch. Ass. Co.* 1 Burr. 341, is in favor of the plaintiff, and that of *Phillips* v. *Barber,* 5 Barn & Ald. 161, is exactly in point.

The loss is to be ascribed to the proximate cause ; *Smith* v. *Scott,* 4 Taunt. 126 ; *Busk* v. *Roy. Exch. Ass. Co.* 2 Barn. & Ald. 73 ; which in this case was the violence of the wind The insured must employ men to navigate and repair his vessel, and if he employs the best he can, he is not answerable for losses occasioned by the perils insured against, though remotely contributed to by their want of care   *Bussy* v. *Don*

---

* See *Yates* v. *Brown, post,* 25

*aldson,* 4 Dallas, 206 ; *Carruthers* v. *Sydebotham,* 4 Maule & Selw. 77. See also *Hodgson* v. *Malcolm,* 5 Bos. & Pul. 336 ; *Law* v. *Goddard,* 12 Mass. R. 112. Extreme care is not necessary, and there is no proof in this case of extreme carelessness. We are entitled to a remedy, either against the insurers or the owners of the railway, and the verdict negatives any claim against the latter.

This is a policy on time, and the insured had a right to go to any port whatever during that time. Though the master had elected to return to Boston, the owner had a right to control this determination. The master may change his port of discharge. *Coolidge* v. *Gray,* 8 Mass. R. 527. In the case of *King* v. *Middletown Ins. Co.* 1 Connect. R. 134, the owner chose the port of discharge, after the arrival of the vessel in the United States.

It is said that the clause making the underwriters liable for " all other losses," is not to be interpreted with the same lati tude here as in England, according to *Butler* v. *Wildman,* 3 Barn. & Ald. 398, because a reference is had in our policies to the rules and customs of insurance in Boston. But there is no special rule or custom in Boston, in regard to the subject in question ; and the case of *Butler* v. *Wildman* was published here before this policy was made.

PUTNAM J. delivered the opinion of the Court. It is contended for the defendants, that they are discharged on the ground of deviation.

The argument is, that having elected at Bahia to go to Bos· ton and actually proceeding upon that voyage, the plaintiff had no right to go to Salem.

We think that this construction would be too narrow. It would take away the liberty which was granted by the policy, to go to " *all ports and places on the globe,*" within the term specified. The limitation would extend as well to the outward, or any intermediate voyage, as to the returning voyage, and would deprive the plaintiff of the commercial or other advantages which might occur, and from profiting by the advices which he might receive on the passages or elsewhere. Now it seems to us, that the parties have used the broad phraseology in the policy with the manifest intent to exclude the con-

struction for which the defendants contend. This policy was for time. The plaintiff was by implication of law required to have the ship properly manned and furnished, and employed in some lawful business; but it was left to his discretion to send her to such ports and places as he should think proper. When she was ordered to Salem, there were three or four months of the term unexpired. The repairs which were required, were from ordinary wear and tear. But it was lawful for the assured to make them, without prejudice to the policy, as it would have been if they had arisen from any perils for which the underwriters were liable. We are satisfied that the plaintiff had a right to order the ship to Salem for that purpose, instead of terminating the policy at Boston by returning to that port.[1]

It does not appear, whether the assured intended to send the ship to Boston or elsewhere, after she had been repaired. Nor is it material that it should. That was the concern of the assured, touching which the underwriters had no right to be informed. It was for the plaintiff to determine whether he would put an end to the policy within the two years or not. After the ship had been repaired, she might have been employed in any lawful voyage or business. In short, there could be no deviation in regard to the port or place to which she might be ordered, for any lawful purpose, within the two years.

It is further contended, that the loss was upon the land, and in the course of a dangerous process of repair, not practised in this country when the policy was made, and for no use connected with the voyage, nor to enable the ship to complete it within the time.

It is proved that the ship was in need of repairs, to enable her to make another voyage; which might be undertaken, if not accomplished, within the time. These repairs could be more expeditiously and safely made upon a marine railway, than by heaving the ship out. The evidence upon this fact is clear. The new mode has almost entirely superseded the old one. The ship being within the protection of the policy when repairing, " the means must be taken to be insured as well as the end." *Per* Lord *Mansfield*, in *Pelly* v. *Royal Exch. Ass. Co.* 1 Burr. 348. The tackle and furniture in the case

---

[1] 2 Phillips on Ins. 158, 159, 174.

cited, were burnt upon the land, in a store where they were properly placed while the ship was having repairs made ; and they were held to be at the risk of the underwriters. So it would unquestionably be, if the ship should be, for good reason, put into a dry dock to be repaired, and be burnt. She would be as much at the risk of the underwriters as if she had been burnt upon the high seas.

The case cited, of *Thompson* v. *Whitmore*, 3 Taunt. 227, proves that if a ship, hove down on the beach to be repaired, should be thereby bilged and damaged, it is not a loss by *the perils of the seas, as the damage happened upon the land* The averment in the declaration was for a loss by the perils of the seas, and the plaintiff was nonsuited. That case was cited in *Phillips* v. *Barber*, 5 Barn. & Ald. 161, which in many particulars is like the case at bar. The policy was for time, " at sea and in port," and the ship was blown over when in the graving-dock for repairs, and bilged. The opinion of the King's Bench was given by *Abbott* C. J., who stated, that " the loss was occasioned by the violence of the wind and weather in port ; and it seemed to him, therefore, to have been produced by a peril *ejusdem generis* with those specified, and to fall within the general words of the policy." In the case at bar, the particular circumstances of the loss are stated with sufficient certainty in the first count. The loss comes within the general description of " all other losses " *ejusdem generis* with those which are named in the policy. It falls within the scope of the policy. See *Butler* v. *Wildman*, 3 Barn. & Ald. 398, *S. P.*[1]

The suggestion, that the parties did not contemplate the repairing of the ship upon a railway, we think would have had great weight, if this had been the first experiment ; but the railway had been tested again and again. It was in common use when the ship was placed upon it. Any prudent shipowner or master would be justified, if not required, to use it. The defendants would have had much more reason to complain of a claim for a loss which might have happened from heaving out or heeling the ship, as formerly practised, when

_____

[1] 2 Phillips on Ins. 191, 194

she might have been placed upon a railway to be coppered The parties may reasonably be supposed to contemplate, that the most approved means shall be employed in repairing, as well as in the management of the ship.[2]

It is further contended for the defendants, that the verdict is against the evidence, upon the point of negligence o' the master of the ship, and of the superintendent of the railway. The jury have found, that the loss was not occasioned by the carelessness or misconduct of either of them.

If it had arisen from the negligence of the master, it would have been a good defence. But upon examining the testimony very carefully, we do not perceive how that allegation could be supported against him. He was bound to make a proper representation of his ship to the superintendent of the railway, and from the testimony of the superintendent himself it would seem that a correct representation was made ; although the superintendent might not have fully comprehended it. The master said, that "the ship was very flat amidships and cut up at each end ;" and so she was. He surrendered the ship to the direction of the superintendent, to have her properly placed upon the railway, and he did, and caused to be done, all things which the superintendent required.

Then it is argued, that there was negligence on the part of the superintendent, in not fashioning the blocks to the form of the bottom of the ship, and that the loss was occasioned thereby. If that were proved, it would not follow that the underwriters should be discharged. The consequences of the negligence of the superintendent should not be visited upon the assured or the master, any more than the negligence of a pilot would be attributed to them. *Carruthers* v. *Sydebotham*, 4 Maule & Selw. **77.** In that case the ship was lost by the misconduct of the pilot, but the underwriters were held to be answerable.

There is evidence upon both sides concerning the alleged negligence of the superintendent. Some witnesses think the ship was destroyed because she was not properly blocked, and others, that she would have gone upon the railway in safety if

---

[2] 2 Phillips on Ins. 176.

the wind had not blown so hard. One witness stated, that at "the critical time" when she touched forward and was waterborne aft, "the squall struck her," and blew her over. It was a question fairly submitted to the jury, and we do not think the Court would be justified in disturbing their verdict, upon that point, whichever way it might have been given.

Upon the view of the whole matter, we are all clearly of opinion that the plaintiff should recover for a total loss.

*Judgment according to verdict.*